**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
DEMOS P. DEMOPOULOS, et al.,                                  :
:
             Plaintiffs,                                :        19-cv-1133 (OTW)
:
             -against-                                  :        **AMENDED OPINION AND ORDER**
:
F & B FUEL OIL CO. INC., et al.,                              :
:
             Defendants.                                :
:
---------------------------------------------------------------x

**ONA T. WANG, United States Magistrate Judge:**

      ECF 75 included a clerical error. The Court amends ECF 75 to correct the error. **This**

**Opinion and Order supersedes ECF 75.**

      Plaintiffs are trustees and fiduciaries of the Local 553 Pension Fund (the "Fund") who

commenced this action against Defendants pursuant to the Employee Retirement Income

Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments

Act of 1980, 29 U.S.C. §§ 1001, *et seq.* ("MPPAA"), to recover unpaid withdrawal liability,

interest, liquidated damages, and attorneys' fees and costs. (ECF 44, Second Amended

Complaint ¶¶ 13-23) ("SAC"). The parties consented to my jurisdiction for all purposes on May

7, 2019. (ECF 21). Defendant Christopher Ficaro was dismissed after his death in 2020. (ECF 58).

      Plaintiffs move for summary judgment after discovery, pursuant to Fed. R. Civ. P. 56(a)

on the two remaining causes of action: (1) breach of a collective bargaining agreement ("CBA"),

and (2) breach of ERISA obligations. (ECF 69). Plaintiffs' motion for summary judgment is

uncontested by Defendant.[1] For the reasons set forth herein, Plaintiff's motion for summary

judgment is **GRANTED**.

I.      **BACKGROUND[2]**

Plaintiffs are the trustees and fiduciaries of the Local 553 Pension Fund (the "Fund"), a

jointly-administered, multi-employer Taft-Hartley Benefit Fund. (ECF 70, Plaintiff's Rule 56.1

Statement, ¶ 1) ("Pls.' 56.1 Stmt."). The Fund was established pursuant to the terms of various

collective bargaining agreements ("CBAs") between Local 553, I.B.T. (the "Union") and various

employers who are required to make contributions to the Fund on behalf of their employees

covered by the CBAs. (*Id.* ¶ 2). The Fund provides various pension benefits to covered

employees, retirees, and their dependents. (*Id*).

Defendant F&B Fuel Oil Co., Inc. ("F&B") was founded in 1947 by Defendant Ferdinand

Ficaro's ("Ficaro") father and a partner, and was dissolved on November 12, 2019. (*Id.* ¶¶ 4-5).

F&B was in the business of delivering heating oil to residences. F&B was a party to a series of

CBAs with the Union that obligated F&B to make contributions to the Fund. (*Id.* ¶ 5). The most

recent CBA, the 2004-2007 Master Agreement, was signed by Ficaro as President of F&B, and

was effective for the period from 2004-2007. (*Id.* ¶ 8). Employers are bound by Articles 47-49 of

the Master Agreement to the Trust Agreement which governs the Pension Fund. (*Id.* ¶ 9). Upon

signing the Master Agreement, F&B agreed to all obligations in the Trust Agreement that

---

[1] The docket reflects that the parties had expressed an intent to cross-move for summary judgment, had requested a briefing schedule for cross-motions, and had proposed submitting a joint appendix instead of separately submitting evidence in connection with their cross-motions. (ECF Nos. 60, 62, 63-65). Indeed, Defendants made the last request for an extension of time to file their cross-motions. (ECF 63). The Court has reviewed the docket and the Joint Appendix and notes that Defendants have neither cross-moved for summary judgment nor filed any opposition to Plaintiffs' motion.
[2] Unless otherwise indicated, the following facts, taken from Plaintiffs' Local Rule 56.1 Statement (ECF 70) and supporting materials, are undisputed.

govern the Pension Fund. (*Id*). During this period, F&B submitted remittance reports and paid

contributions pursuant to the Master Agreement. (*Id.* ¶ 8).

After 2007, Ficaro and his son, Christopher Ficaro, continued to submit remittance

reports and pay contributions to the Fund pursuant to the Master Agreements until

approximately April 2016, submitting a total of 112 remittance reports. (*Id.* ¶¶ 10-11). In the

years between 2007 and April 2016, F&B also submitted to nine Fund audits and paid amounts

found to be owing to the Fund(s). (*Id.* ¶ 12).

In around 2014-2015, Ficaro and his son created F&F, which stood for "Ficaro & Ficaro."

(*Id.* ¶¶ 21-23). It did business as Paradise Fuels and used the same trucks, employees, and office

space as F&B. (*Id.* ¶¶ 21-29, 66). Both Ficaro and his son testified that F&F was created because

of F&B's "financial troubles," and the companies overlapped as F&B wound down and F&F

began operations. (*Id*.) Both Ficaro and his son testified that Christopher Ficaro became

president of F&B in 2005 (*Id.* ¶ 43), while Ficaro is the owner and president of F&F (*Id.* ¶ 53).

Ficaro and his son paid themselves through both companies, transferred money freely between

the companies and to themselves, and paid personal expenses directly with the company

accounts. (*Id.* ¶¶ 68-69, 73-76, 79). F&F and F&B both do business as Paradise Fuels and shared

the same address until a foreclosure at the shared location. (*Id.* ¶¶ 63-64). F&F and F&B also

both shared the same phone number and fax number. (*Id.* ¶ 71).

As relevant to this motion for summary judgment, F&B (and on at least one occasion,

F&F) paid some contributions to the Fund after F&B was notified of its underpayment of, or

failure to pay, contributions. (*Id.* ¶¶ 7-13; 72-73). By April 2018, Christopher Ficaro wrote to the

Fund, seeking a freeze on payments to the Fund due to financial hardship. (*Id.* ¶¶ 14-15). The

Fund calculated F&B's withdrawal liability to be $255,248 and sent a written demand and

payment schedule to F&B with monthly payments to commence on December 1, 2017. (*Id.* ¶

32). F&B did not challenge the withdrawal liability assessment or the withdrawal date, nor did it

demand arbitration. (*Id.* ¶ 32).

Upon review of this case and in preparation for its motion for summary judgment, the

Fund learned that it had used an erroneous withdrawal date in calculating F&B's withdrawal

liability, and that the correct withdrawal date would have resulted in a correct withdrawal

liability of $258,708. (*Id.* ¶¶ 40-41; ECF 67 ¶ 20). The Fund now seeks the lower (incorrect)

amount of withdrawal liability, even though neither withdrawal date was contested by

Defendants. (Pls.' 56.1 Stmt. ¶ 42; ECF 67 ¶ 21). Indeed, although Defendants sought and

received an extension to file their opposition to the summary judgment motion (*see* ECF 63; ECF

65), they did not file any opposition to this summary judgment motion.

## II.    LEGAL STANDARD

A court shall grant a motion for summary judgment "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c). "The party seeking summary judgment bears the burden of establishing that no genuine

issue of material fact exists and that the undisputed facts establish her right to judgment as a

matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995).

If a non-moving party fails to oppose a summary judgment motion, "summary

judgment, if appropriate, shall be entered against" it. Fed. R. Civ. P. 56(e). The Second Circuit

"has made clear, however, that where the non-moving party chooses the perilous path of

failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir.2004) (citation and quotations omitted). If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then "summary judgment must be denied even if no opposing evidentiary matter is presented." *Id.* at 244.

To that end, Defendants' failure to oppose Plaintiffs' motion alone does not justify the granting of summary judgment. Courts have, however, granted unopposed motions for summary judgment "so long as [movants] have met their threshold burden of production." *Washington v. City of New York*, No. 05-CV-8884 (LAP), 2009 WL 1585947 (S.D.N.Y. June 5, 2009).

## III.   DISCUSSION

### 1.   <u>Withdrawal Liability</u>

The MPPAA requires an employer who is obligated to contribute to a multiemployer pension plan to pay its proportionate share of the plan's unfunded vested benefits upon withdrawal from the plan. *See* 29 U.S.C. §§ 1381(a), 1399; *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 724–25 (1984). "The purpose of withdrawal liability is to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers.'" *I.L.G.W.U. Nat'l Retirement Fund v. Levy Bros. Frocks, Inc.,* 846 F.2d 879, 881 (2d Cir.1988). Indeed, the MPPAA was designed to "protect the interests of participants and beneficiaries in

financially distressed multiemployer plans and to encourage the growth and maintenance of multiemployer plans." *T.I.M.E.-DC v. Management–Labor Welfare & Pension Funds,* 756 F.2d 939, 943 (2d Cir. 1985). The MPPAA grants broad authority to pension plan sponsors to collect withdrawal liability. Initially, the plan sponsor must decide whether a withdrawal has occurred, the amount of the employer's withdrawal liability, and the schedule for liability payments to the fund. *See* 29 U.S.C. §§ 1381, 1382(1), 399(b) (1)."In order to prevail on a claim for withdrawal liability under the MPPAA on summary judgment, a plaintiff must establish that (1) defendant constituted an "employer" under the MPPAA prior to withdrawal; (2) defendant received notice of the withdrawal liability assessment against it; and (3) defendant failed to initiate arbitration as required by the MPPAA."[3] *Finkel v. Athena Light & Power LLC*, No. 14-CV-3585 (DLI) (PK), 2016 WL 4742279 (E.D.N.Y. 2016) (internal citations omitted).

There is no dispute that F&B is an employer under the MPPAA before withdrawal. F&B was a party to the CBAs through 2007, which obligated it to make contributions to the Pension Fund on behalf of its covered employees. (Pls.' 56.1 Stmt. ¶ 5). Pursuant to that agreement, F&B submitted remittance reports and paid contributions to the Pension Fund. (*Id.*). From 2007 until "approximately April of 2016," F&B continued to submit remittance reports, to pay

---

[3] Once the plan sponsor notifies an employer of liability, the employer has 90 days to seek reconsideration regarding the alleged liability. *See* 29 U.S.C. § 1399(b). If the parties do not resolve the dispute, either party may initiate arbitration, but they must do so within 60 days after the earlier of either (1) notification by the plan sponsor of the result of the requested reconsideration, or (2) 120 days after the date reconsideration was requested. *See* 29 U.S.C. § 1401(a)(1); *see also Bowers v. Transportation Maritima Mexicana, S.A.,* 901 F.2d 258, 261 (2d Cir.1990). If neither party demands arbitration within the statutorily prescribed time limits, the amounts demanded become "due and owing on the schedule set forth by the plan sponsor," and the employer is estopped from challenging any factual determination of the plan sponsor concerning the assessment of withdrawal liability. *See* 29 U.S.C. § 1401(b)(1); *see also Levy Bros. Frocks, Inc.,* 846 F.2d at 886–87; *see also New York State Teamsters Conf. Pension & Retirement Fund v. McNicholas Transp. Co.,* 848 F.2d 20, 23 (2d Cir.1988). In other words, a failure to initiate arbitration within the statutory time period operates to fix withdrawal liability and foreclose any challenge to its imposition. *See I.L.G.W.U. Nat'l Retirement Fund,* 846 F.2d at 886–87.

contributions on behalf of covered employees, and to submit to audits of its books and records, paying amounts found to be owed as a result of those audits. (ECF 67 ¶ 6).

F&B received the Fund's notice of the withdrawal liability assessment on November 16, 2017. (Pls.' 56.1 Stmt. ¶ 32). Under Section 1399(b), F&B had 90 days – or until February 14, 2018 – to have requested reconsideration of the notice of withdrawal liability, which it did not do. On March 23, 2018, the Fund sent another letter, informing F&B that it had 60 days to cure its default and make withdrawal liability payments. (*Id.* ¶ 36). F&B has not contested the withdrawal date, the amount owed,[4] or sought arbitration. (ECF 67 ¶ 21).

Accordingly, F&B is liable to the Fund for the entire amount of its withdrawal liability, plus interest, liquidated damages, costs and attorneys' fees.

### 2.    Calculation of Liability

In any action to collect withdrawal liability "in which a judgment in favor of the plan is awarded, the court shall award the plan," in addition to the unpaid withdrawal liability, reasonable attorneys' fees and costs, interest, and liquidated damages. *See* 29 U.S.C. §§ 1132(g)(2)(B). Such award is a mandatory remedy. *See Nat'l Pension Plan of the UNITE HERE Workers Pension Fund v. Swan Finishing Co.,* No. 05-CV-6819 (SAS), 2006 WL 1292780 (S.D.N.Y. May 10, 2006).

---

[4] Upon review, the Fund's counsel found that the correct withdrawal date for F&B should have been December 16, 2016, not July 26, 2017. (ECF 67 ¶ 20). The Fund's actuary confirmed that F&B would owe more in withdrawal liability if the amount owed is calculated based on the correct withdrawal date. (*Id.*). However, since the Fund is not seeking the higher, correct amount, the Court finds this discrepancy is not at issue.

1.   *Withdrawal Liability*

The Fund initially assessed F&B's withdrawal liability to be $255,248, based on a withdrawal date of July 26, 2017 and payments and interest due beginning December 1, 2017. The Fund used July 26, 2017 as the withdrawal date since that was the date the union disclaimed interest in F&B. (ECF 67 ¶ 12). F&B did not contest this determination, even though the Fund later determined that the correct withdrawal date should have been December 16, 2016. (ECF 67 ¶¶ 15, 20). Using a withdrawal date of December 16, 2016, resulted in a higher withdrawal liability than the amount that had been sought by the Fund in 2017, so the Fund now seeks the lower, albeit incorrect, amount of $255,248. (*Id*).

2.   *Interest*

The Trust Agreement further provides that interest at 18% per annum is due from the date the first payment was due, which was December 1, 2017. (ECF 67 ¶ 22). Based on a withdrawal liability of $255,248, the Fund calculates the interest amount due from December 1, 2017 through March 19, 2021 as $151,554.37, with additional interest accruing at the rate of $125.88 per day. (ECF 67 ¶¶ 23-27). Interest liability from December 1, 2017 through November 30, 2022, plus December 1, 2022 and December 2, 2022, is calculated as: ((365 x 4) + 366 + 2) days x $125.88/day = 230,108.64.

3.   *Liquidated damages*

Liquidated damages are assessed as the greater of 1) the additional interest due, here, $230,108.64, or 2) 20% of the amount due (0.20 x 255,248 = 51,049.60). Accordingly, the Fund is awarded $230,108.64 in liquidated damages.

4.      *Attorneys' Fees and Costs*

The Agreements further provide that the Fund shall recover costs and attorneys' fees, which Plaintiffs' counsel has calculated to total $124,943.60. (ECF 66-1 at 38-39; ECF 67 at 6). Plaintiffs' counsel determined Plaintiffs' attorneys' fees to be $120,345.00 and their costs to be $4,112.52. (ECF 68-1 ¶¶ 14, 17). Pursuant to Section 502(g)(2)(D) of ERISA, a court must award reasonable attorneys' fees to a successful plaintiff in an ERISA suit. *See* 29 U.S.C. § 1132(g)(2)(C); *see Annuity, Pension, Welfare & Training Funds of the Int'l Union of Operating Engineers, Loc. 14-14B, AFL-CIO v. Superior Site Work, Inc.*, No. 15-CV-543 (MKB), 2017 WL 639248, at *6 (E.D.N.Y. Feb. 16, 2017). The amount awarded, however, is left to the discretion of the court. *See Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds Int'l Union Operating Eng'rs, Local 15, 15A, 15C & 15D, AFL-CIO v. Eastport Excavation & Utils, Inc.*, 3 F. Supp. 3d 204, 218 (S.D.N.Y. 2014) (quoting *Gesualdi v. RRZ Trucking Co., LLC*, No. 03-CV-3449 (ETB), 2011 WL 1988374, at *7 (E.D.N.Y. May 20, 2011)). In determining an award of reasonable attorneys' fees, courts in the Second Circuit use the "presumptively reasonable fee" method, which considers "what a reasonable client would be willing to pay." *See Superior Site Work*, 2017 WL 639248, at *6 (quoting *Trs. of Local 813 Ins. Trust Fund v. Bradley Funeral Serv., Inc.*, No. 11-CV-2885 (ARR) (RLM), 2012 WL 3871759, at *5 (E.D.N.Y. Aug. 10, 2012), *report & recommendation adopted by* 2012 WL 3871755 (Sept. 4, 2012)). The "presumptively reasonable fee" is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *See Superior Site Work*, 2017 WL 639248, at *6. Also relevant to the court's reasonableness determination is consideration of all case specific variables. *See Finkel v. Allstar Elec. Corp.*, No. 11-CV-3222 (KAM) (RER), 2013 WL 4806951, at *10 (E.D.N.Y. Sept. 9,

2013); *see also Superior Site Work*, 2017 WL 639248, at *7. One such variable, called the "forum

rule," is consideration of the prevailing rates for similar legal services "by lawyers of reasonably

comparable skill, experience, and reputation," within the community in which the district court

sits. *See Allstar Elec. Corp.*, 2013 WL 4806951, at *10; *see also Superior Site Work*, 2017 WL

639248, at *6.

   When a party seeks reimbursement for attorneys' fees, it must convince the court that

the rates and hours are reasonable and are "supported by contemporaneous time records,

affidavits, and other materials." *See Trs. of the Pavers and Rd. Builders Dist. Council Welfare,*

*Pension, Annuity and Apprenticeship, Skill Improvement and Safety Funds v. D. Gangi*

*Contracting Corp.*, No. 16-CV-02938 (ARR) (RER), 2017 WL 3447758, at *5 (E.D.N.Y. May 12,

2017), *report & recommendation adopted by* 2017 WL 3432363 (Aug. 9, 2017). Here, Plaintiffs

submitted an affidavit from their counsel and contemporaneous time records detailing

counsel's work on the case, the date on which the work occurred, and the number of hours

expended on such work. (ECF 68-1).

   Plaintiffs' counsel is the law firm of Friedman & Anspach, which specializes in

representation of labor unions and employee benefit plans, and has represented this Fund for

over 30 years. (ECF 68 ¶ 6). Plaintiffs' counsel used a blended rate of $565 for the six attorneys

who billed any time to the case. (ECF 68 ¶ 7). Erin McGee, who billed 159 out of a total of 213

hours (~75%) on the case, is a 2005 graduate of Fordham Law School. (ECF 68 ¶¶ 12, 16). Only

two attorneys on the case were more junior, one being a 2012 graduate of Columbia Law

School and another a 2013 graduate of NYU Law School, and together they only billed 19.75

hours. (ECF 68 ¶¶ 9-13, 16).

In total, counsel here billed 213 hours, from February 2019 through March 2021, when Plaintiffs filed their motion for summary judgment. (ECF 68 ¶ 14). Although six timekeepers billed to the matter, 75% of the hours billed were worked by Attorney McGee, who was primarily responsible for the litigation of the case. (ECF 68 ¶ 12). After review of the contemporaneous billing records, I find that the time spent litigating this case was reasonable. The time covered the filing of a complaint and two amended complaints, settlement communications, court conferences, discovery (including third-party discovery and multiple depositions), and preparing and filing a motion for summary judgment. Moreover, as the case proceeded in discovery, counsel sought to amend their complaint to add – and also briefed at summary judgment – alternate theories of corporate and individual liability.

Further, although the firm's requested blended hourly rate of $565 is higher than previously sought and awarded to the firm in other ERISA cases, the Fund has been a client of the firm for over 30 years and apparently has been charged and is willing to pay a blended rate of $565 per hour. *See Odeon Cap. Grp., LLC v. Ackerman*, No. 16-CV-274, 2018 WL 1089749, at *2 (S.D.N.Y. Feb. 2, 2018) (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 190 (2d Cir. 2008) for proposition that "the reasonable hourly rate is the rate a paying client would be willing to pay," and collecting cases finding hourly rates of $550-600 in FLSA cases to be reasonable); *cf. Demoupoulos v. Advance Transit Co., Inc.*, No. 20-CV-5186, 2021 WL 6424599, at *4 (E.D.N.Y. Dec. 17, 2021) (requesting $515/hour and receiving $400/hour for partners, and $300/hour for associates at Friedman and Anspach in a case where defendants never appeared or filed an answer). Here, while Attorney McGee is not a partner, she is only four years junior to the partner referenced in *Advance*

*Transit*, and this case is significantly more complicated than *Advance Transit*. *See also Division 1181 Amalgamated Transit Union—New York Employees Pension Fund v. D & A Bus Company, Inc.* 270 F.Supp.3d 593, 617 (E.D.N.Y. 2017) (discussing factors to be considered in considering reasonable hourly rate, including complexity and difficulty of case). Thus, I find that $565 per hour is a reasonable blended hourly rate, and that $120,345 is a reasonable attorneys' fee award.

The firm also seeks reimbursement of costs totaling $4,112.52. Requested costs must generally be substantiated by affidavit and supported by receipts. *Id.* at 627 (citing cases and Local Rule 54.1). The only exception is for the filing fee, which is sufficiently substantiated because it is reflected on the docket. *Id.* at 628. Items such as postage and online legal research are generally considered overhead and not reimbursable. *Id.* at 630 (collecting cases in S.D.N.Y. and E.D.N.Y. declining to award electronic research fees as part of costs).

In addition to filing fees, the firm seeks service fees as well as reimbursement for subpoenas, deposition transcripts, UPS "overnight mail" and costs of "computer assisted legal research." (ECF 68-2 at 2). The last two categories, overnight mail ($187.28) and online legal research ($699.43), are not reimbursable. Service fees, as well as deposition transcripts and subpoenas for evidence used by the Court in deciding the summary judgment motion, are likely reimbursable but are not supported or substantiated in ECF 68. Accordingly, the only cost at this time that is both substantiated and supported is the $400 filing fee.

If Plaintiffs seek reimbursement for costs beyond the $400 filing fee, they shall file an amended motion for costs no later than **December 16, 2022**, that conforms to Fed. R. Civ. P. 54 and Local Rule 54.1.

3. __Joint and Several Liability__

Plaintiffs contend that F&F and Ferdinand Ficaro are jointly and severally liable for F&B's withdrawal liability under theories of single employer, successor and alter ego liability. (ECF 69 at 10-23). The Court agrees.

1. *F&F liability under Single Employer and Successor Liability*

Separate companies are considered a single employer if they are part of a single integrated enterprise. *See Lihli Fashions Corp., Inc. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996) (internal quotations and citations omitted). The Supreme Court articulated a four-factor test to determine single employer status. *See Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256 (1965) (*per curiam*). The "controlling criteria . . . are interrelation of operations, common management, centralized control of labor relations and common ownership." (*Id*). Although nominally separate, F&F and F&B at all times relevant to this action had common ownership and management through Ferdinand Ficaro and his son Christopher Ficaro. (Pls.' 56.1 Stmt.  ¶¶ 43-54). Both companies used the same d/b/a, "Paradise Fuel," and the same trucks to deliver fuel oil to their customers. (*Id.* ¶¶ 21-29, 63-64, 66). Both companies share garage and office space, the same phone and fax number, and the same employees. (*Id.* ¶¶ 28, 55-58, 63-71). The companies shared funds and loaned money without interest. (*Id.* ¶¶ 72-79).

F&F is also liable as a successor to F&B. *See Stotter Div. of Graduate Plastics Co., Inc. v. District 65, United Auto Workers, AFL-CIO*, 991 F.2d 997, 1001-1002 (2d Cir. 1993) (finding successor liability for ERISA contributions where successor had notice of arbitration and where businesses had "substantial continuity of identity in the business enterprise before and after

the change") (*citing John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 551 (1964)). Here, F&F

and its principals, the Ficaros, clearly had notice of the Fund's claims and there was substantial

continuity of identity of the business enterprises.

  2. *Alter Ego liability of F&F and Ferdinand Ficaro*

  Plaintiffs also claim that F&F and Ficaro are liable as alter egos of F&B. The Court agrees.

"[A]lter ego liability does not arise from any particular statutory provision at all, but rather from

a general federal policy of piercing the corporate veil when necessary to protect employee

benefits." *See New York State Teamsters Conference Pension and Retirement Fund v. Express

Services, Inc.* 426 F.3d 640, 647 (2d Cir. 2005); *see also Moore v. Navillus Tile, Inc.*, 276 F.3d 110

(S.D.N.Y. 2017) (articulating factors to consider in finding companies to be alter egos in ERISA

context) (vacated as moot due to settlement at *Moore v. Navillus Tile, Inc.*, No. 14-cv-8326,

2018 WL 7048697 (CM) (S.D.N.Y. Oct. 26, 2018)). The inquiry on alter ego status "focuses on

commonality of (i) management, (ii) business purpose, (iii) operations, (iv) equipment, (v)

customers, and (vi) supervision and ownership." *See Express Services*, 426 F.3d at 649-50.

(quoting *Newspaper Guild of N.Y. v. NLRB,* 261 F.3d 291, 294 (2d Cir.2001)).

  The analysis is similar when considering whether to pierce the veil to reach an individual

officer, generally requiring that "(1) the owners exercised complete domination of the

corporation in respect to the transaction attacked; and (2) that such domination was used to

commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury." *See JSC

Foreign Economic Association Technostroyexport v. International Development and Trade

Services, Inc.*, 386 F.Supp.2d 461, 464 (S.D.N.Y. 2005). The Second Circuit has stated that alter

ego liability "may be predicated either upon a showing of fraud or upon complete control by

the dominating corporation that leads to a wrong against third parties." *See Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991). Factors to consider when assessing dominion sound in agency, and overlap considerably with the facts considered in assessing single employer liability. *Id.* at 139.

It is undisputed here – and supported by discovery – that there is commonality of management, business purpose, operations, equipment, customers, supervision, and ownership between F&B and F&F, such that F&F is subject to withdrawal liability as an alter ego of F&B. (*See, e.g.*, Pls.' 56.1 Stmt. ¶¶ 45-47, 58, 61, 63-79).

The same is true for Ferdinand Ficaro. Plaintiff does not assert that Ficaro used the companies to engage in fraud, but rather that Ficaro used F&B and F&F to pursue his own ends, rendering the entities "unable to pay withdrawal liability to the Fund, thus injuring the Fund." (ECF 69 at 20). Both Ferdinand and Christopher Ficaro admitted at deposition that they did not observe corporate formalities for either company, and that F&B had no corporate documents. F&F produced articles of incorporation but no other corporate documents or records. Ficaro caused loans and transfers to, from, and between the companies without proper documentation, paid personal expenses with corporate funds, and on at least two occasions took funds from F&F within days of F&F receiving large sums from lenders. At the time these transfers were made, F&B and F&F already were on notice of the withdrawal liability, and the amounts taken from the companies would have been sufficient to make the requisite payments of the withdrawal liability. (ECF 69 at 20-23).

**IV.    CONCLUSION**

For the reasons set forth above, the Court grants Plaintiffs' Motion for Summary

Judgment and orders Defendant to pay Plaintiffs the following:

(1) $255,248 in all unpaid withdrawal liability;

(2) $230,108.64 in prejudgment interest;

(3) $230,108.64 in liquidated damages;

(4) $120,345 in attorneys' fees;

(5) $400 in legal costs; and

(6) Post-judgment interest on the entire monetary award at the rate set out in 28 U.S.C.

§ 1961.

The Clerk of Court is respectfully directed to enter judgment accordingly and to close

this case.

**SO ORDERED.**


_s/ Ona T. Wang_

Dated: February 13, 2023                                    **Ona T. Wang**
   New York, New York                         United States Magistrate Judge